MAMANI versus LOZADA Council, just until we clear the courtroom, or settle it down, put it that way. Thank you. May it please the court, James Tice on behalf of the plaintiffs. The jury's unanimous special verdict in this case made two specific findings for each of the eight victims, that each one died as a result of an extra judicial killing by a Bolivian soldier, and that each defendant was secondarily liable under the command responsibility doctrine. Now, without reaching the command responsibility issue, the district court vacated the verdict under Rule 50 due to a supposed lack of evidence of deliberated killings by Bolivian soldiers. But under the exceedingly deferential Rule 50 standard, which requires accepting all of plaintiff's evidence as true and drawing all reasonable inferences in plaintiff's favor, the only question is whether a rational jury could find it more likely than not that Bolivian soldiers acted with deliberation when they killed these eight victims. Now, at trial, plaintiffs offered an extraordinary amount of direct evidence over three weeks, including testimony from eyewitnesses to the shootings, and even from soldiers who were ordered to fire at unarmed civilians, along with- Can I ask you a question? Sure. And we haven't talked about this at all, but let's say that we were to conclude that the district court conflated the deliberated, the extra judicial findings, I guess, the command responsibility issue. What would you say the remedy would be? Would we send it back for the district court to separately consider the command responsibility doctrine? Would we decide it ourselves? What would you recommend? Well, I think in this case, Your Honor, because it is, at least in our view, it's so clear that the district court did err on the extrajudicial killing, that I think it would be perfectly appropriate for this court to also rule in our favor on command responsibility and find that there was easily sufficient evidence of that as well. But I think at a minimum, to the extent this panel had any doubt about that, certainly the ordinary course would be to remand and allow the district court to look at that issue in the first instance. It is, after all, a fact-intensive issue. Having said that, we think there is more than sufficient evidence as to each of the three prongs for command responsibility, and I'd be happy to talk about them with you to the extent you have questions. I'm also happy to talk about the extrajudicial killing ruling, to the extent the panel has questions about that. But I think this was— Just to be clear, I'm just speaking for myself. We have not confirmed. Of course. So you should say whatever you feel you need to. I want to be here to answer your question. So continuing on the extrajudicial killing point, though, for the moment, viewing the evidence that we presented as a whole, I think a fair-minded jury could easily infer that Bolivian soldiers acted with deliberation when they fired the fatal shots. And I think, as Your Honor's question noted, the district court seemed to conclude otherwise by sort of conflating command responsibility and extrajudicial killing. But as we pointed out, the jury—and if you look at the jury verdict form, it's document number 474 in appendix 2. It makes this very clear. For each of the eight victims, there are two questions that the jury was asked to decide. Number one, was it a deliberated killing by a Bolivian soldier? Yes or no. If the answer is yes, then it asks, do you find each of the two defendants responsible under one of three secondary liability theories? And for each one of them, the district court checked, yes, it was a deliberated killing by a Bolivian soldier. And two, it was that each defendant was secondarily liable under a command responsibility doctrine, not conspiracy and not agency. So just to be clear about that, under the command responsibility doctrine, there's a lot of discussion about a plan. It's not clear to me that there must be a plan in order for command responsibility doctrine to attach. I don't know if you wanted to speak to that at all. Yeah, there does not have to be a plan, Your Honor, under very well-established command responsibility doctrine, both in the Supreme Court and in this circuit. It's a venerable doctrine. The Ford case from 2002, the Drummond case from 2015, which are both cited in our pleadings, they make very clear that no plan is required. And in fact, in 2006, I believe, the Arce v. Garcia case, that this court actually affirmed a finding of command responsibility against a defense minister, as in this case, despite the fact that there were no allegations of a plan or any orders to participate in the alleged extrajudicial killings. It seems like the district court discussed this plan concept. And so let me ask you, if we were to conclude that we needed to send it back on the command responsibility doctrine, do you think we would need to provide any kind of instruction or the idea of a plan or anything else? I think that, certainly, Your Honor, the remand should make clear that no plan is required. After all, again, I think the Ford— Is your argument that this is a case of strict liability, basically? No, Your Honor, not at all. It's not? No. Not under the command responsibility doctrine. It's not a strict liability offense at all. It has three different requirements. The jury had to find, first, that the defendants had effective control over the military. But two, going to your point, that the defendants either knew that extrajudicial killings were occurring or should have known under the circumstances at the time. And finally, that even if they knew of these essentially war crimes, that they did nothing to prevent or punish them. So it's not strict liability at all. It's not respondeat superior. It's a situation where— Well, if any of those other pillars failed, then you lose. We would lose— On the command of responsibility doctrine. In the sense that had the jury ruled against us, we would have lost. Or if— Since there is no strict liability, you have to have the predicates. We have to show command responsibility, Your Honor, and we did. And we did with ample evidence before the jury. The predicates—command responsibility are magic words. Command responsibility is a legal test. I understand that. But it's not strict liability. Correct. Definitely not strict liability. It's very far from it, in fact. Okay. We put on extensive evidence at trial as to each— I understand. I just want to make clear that your position is not that it's strict liability. Of course not, Your Honor. No. If that were the case, the head of state in every one of these cases would be automatically liable. That's correct, Your Honor. Exactly right. And I think in this circumstance, too, there's little fear of that. This is actually a circumstance where the Bolivian government waived sovereign immunity on behalf of these two defendants, and the State Department—I think this is critical— accepted that waiver of responsibility. So the whole reason why this case was allowed to go forward was because the normal immunity doctrines that might apply were waived by both governments, both relevant. So just to be clear, although a plan could satisfy the command responsibility doctrine, your position is it's not necessary. Absolutely, Your Honor. It's very clear that it's a new or should-have-known standard, and there was ample evidence that they both knew about these deaths as they were occurring. They were receiving contemporaneous reports. There was widespread media reports. There was dissension within their cabinet and throughout the entire government. This was a situation where it was simply not credible to find that these two defendants could not have known about these mounting civilian deaths, these extrajudicial killings, as they were occurring. And, in fact, they ended up having to flee the country as a result of these mounting deaths. So the jury had lots of evidence before it. And I should say, Your Honor, too, ultimately it's not a question of whether this panel or the district court thought our evidence was believable. It was a question of whether the jury did. And clearly they did with respect to both the extrajudicial killing point and the command responsibility doctrine. Right. So if we were to decide on the command responsibility doctrine issue, then all we would be deciding is whether or not there was enough evidence that if a jury believed it would have satisfied the requirements to establish command responsibility. That's right. If any rational jury could have looked at this evidence and said, we believe it is more likely than not that these individuals exercise command responsibility. It's more likely than not that each of those prongs were satisfied. That's all this court has to decide. It doesn't actually have to believe the evidence itself. So, again, I'm happy to walk through some of that evidence, too, because I think it was so overwhelming. But, for example, for the superior-subordinate relationship, it's a question of effective control. That can be either de jure, which creates a presumption of effective control, or de facto. And here you have situations where President Lozada was actually giving mobilization orders to subordinates. There was extensive testimony that the military adhered to the orders of the superiors. This was a situation where people followed orders. They didn't move. They didn't go to the bathroom. We could almost take judicial notice of that, couldn't we? There was plenty of evidence. If you have a genuine military organization with structure, that's absolutely right. It's presumptively that people are going to follow orders. Otherwise, you'd have anarchy. Absolutely. But you don't even need to take judicial notice because there was ample evidence of it, as well as de jure control. And, in fact, this was not a situation where these two individuals were at some high remove from what was going on. They were intimately involved. They were issuing mobilization orders. Defendant Berzain was actually on the ground in two of the conflict areas where civilians were being killed. And I should put this in context, Your Honor, as well. Bolivia is not a huge country. It's approximately 10 million people. When 60 people die over a three-week period in mounting escalations of violence and hundreds more wounded, and there are reports coming in from the media, from the Catholic Church, from within the own cabinet, the vice president resigned, saying these deaths are a result of essentially widespread killings by soldiers who were ordered to shoot at anything that moves. They were even ordered to shoot at unarmed civilians below the belt because, and they said, shoot at anyone with weapons above the belt, anyone else below the belt. I mean, that's really incredible testimony. I just want to emphasize, in fact, how extraordinary that sort of testimony was because not only were you getting... Maybe from conscripts in the military, right? That's exactly my point, Your Honor. It was not only testimony with respect to the witnesses to the killings themselves, but actually the soldiers on the ground. That's not the sort of evidence you would ordinarily get in a case like this. This is really incredible. The jury was hearing all this evidence. Wasn't there also some evidence that some of the conscripts refused the order and one of the superiors then took the gun from the conscript and killed him with it? That's exactly right, Your Honor. This was Appendix 3, Document 41 at page 42. There were officers being urged to shoot at the people, that civilians, unarmed civilians. When they did not do so, one of the officers actually took the conscript's gun and shot him with it. The jury heard that sort of extraordinary testimony. So, again, I'm happy to reserve my time for rebuttal, but I think there was ample evidence of those problems. May it please the Court, I'm Steve Raber for the appellees who are here in the courtroom today. I'm going to refer to them as the defendants for ease of reference. Eight years ago, this Court held that the facts alleged in the original complaint did not meet the test for extrajudicial killing. Plaintiffs amended their complaint and promised a new piece of evidence that they said was critical, that there was evidence of a premeditated plan to kill civilians before the defendants ever took office. And that evidence never materialized at trial. Well, whether it did or it didn't, there was evidence that was at trial that was not in the complaint that was before us in 2011. I would say it falls short of what was alleged in the complaint. And I would say that this is a case where it's important to look behind the briefs. Well, let me ask it to you this way. Would you agree that there are two separate issues that we have to address? One, for extrajudicial killings I'm talking about. One is whether there were deliberated killings. And the other, if so, only if so, whether the command responsibility doctrine, whether there was sufficient evidence to conclude that the command responsibility doctrine applied. Yes. And the District Court addressed one of those in its Rule 50 order. The deliberated killings. The deliberated killing one. Right. And did not address the command responsibility, which was fully briefed. Right. Now, even assuming that a plan is required, which I don't think that's correct. That's not what we're saying. And that's not what the District Court was saying. What the District Court was saying was this court held in Mamani 1 that precipitate shootings during an uprising are not extrajudicial killings. I agree with that. I completely agree with that. And so what the judge said was we have . . . But don't we have evidence here of more than precipitate or random killings that happen as a . . . No evidence. I'm sorry. I'm sorry. I don't mean to interrupt. That's okay. Don't we have more than evidence of just precipitate killings? I mean, when you have evidence that soldiers are being instructed to shoot anything that moves, to shoot unarmed civilians, to shoot them below the waist, even though they present no danger at all to the officers, why isn't that sufficient evidence to establish that there were deliberated killings, that is, killings where the soldiers intended to kill these people not pursuant to a valid order? That's not connected to any of the decedents, and that was the same issue in the complaint that was dismissed, the random episodes around. And we need to look behind the briefs here, Your Honor, and look at the record, because the testimony . . . Let's take the testimony of the soldier, Vargas. Can I ask you why it's not connected? Because it seems to me that when the soldiers are being instructed to shoot at anything that moves, and we have evidence that has been put on the record . . . I'd like to get to that. I'd like to ask you about it. Okay. Where, for example, an individual is outside, he's unarmed, and he is shot at, why is that not the kind of evidence that would provide what's necessary in order to conclude there were deliberated killings? This court held in Mamani 1 that, first of all, there's no evidence of who fired any shot or why. But there doesn't have to be. We've never said, and as far as I know, no court has ever said that in order for there to be evidence of a deliberated killing that you need to be able to identify who shot whom. I understand. In those cases, if you look at them, like Jaramillo, for example, that was a case where the defendant was in prison after pleading guilty. His subordinate was witnessed killing someone. Nobody knew who that was. They knew that it was a subordinate. But the person died, had three gunshots to the back of their head. That was the only inference that it was a deliberated killing. Similarly, in the Fritz case, soldiers abducted from the battlefield in Iraq, they're taken away. Nobody knows who shot and killed them, but they had execution-style wounds and their body armor had been removed. Let me ask you something. You are not arguing that if soldiers were told to shoot at anything that moves and they in fact shot at anything that moved, and some of the victims of that were the plaintiffs in this case, that that is not a deliberated killing, are you? If a soldier who fired and killed one of the decedents, if it was done pursuant to an order to shoot anything that moved and following the order with regard to that decedent, I would say that that could be a deliberated killing by that soldier. Now, the second question is whether or not— Why couldn't the jury find that that's what happened here based on the evidence that was submitted? Because there was no evidence of that. There was no testimony about that, the so-called eyewitnesses. Let's just look behind the briefs. They say in their brief, another eyewitness recounted how he watched five soldiers shoot at Lucio while Lucio was unarmed and trying to hide. That's a pretty vivid eyewitness testimony. If you go look at the witness, Castaño, here's his testimony. Quote, I couldn't tell whether it had been any of the military that gave the shot because all I did was hear the shot. That's a far cry from what is said in the brief. Another eyewitness for Marcelino, the decedent, his wife testified, quote, I can't lie. I didn't see them shooting. The council admitted that no one saw anyone shoot Marlene in Morosada. Teodosio, the woman who was pregnant, the bullet came through a wall on a downward angle on the second story and the eyewitness there said all we saw was smoke. We hear all this talk about eyewitness testimony, but what did they say? Let's look behind the brief at the soldier in Morosada, the one who said the order was shoot anything that moved. In the reply brief they said a soldier in Morosada on September 20th never saw armed civilians. What did he say? Page 65, I saw tear gas and heard dynamite blasts and bullets when I entered Morosada. Page 67, I saw people stationed in trees on sides of the road and reported it to my commander. Pages 112 and 113, the peasants had weapons and were firing at us. Bullets were flying. Page 38, there was shooting back and forth when the soldiers went into homes. Page 69, I saw injured police who had been shot. Page 69, the police were desperate for help. They told me to shoot because there were no war weapons. Page 76, he saw a body of a member of his unit who had been shot and killed. It was after the police and after the soldiers had been shot, injured, and killed that Lieutenant Miranda ordered him to remove his nonlethal ammunition and switch to lethal ammunition. As to the order shoot anything that moved, the actual order was shoot anything that moved, shoot below the belt. For anybody who has a gun or dynamite, shoot above the belt. And the soldier testified at page 78 that the purpose of that order, the purpose of that order was designed to minimize the risk that unarmed people would be killed. That's the record. Well, I mean, unarmed people were killed, even people who followed that instruction. I mean, people shot below the belt at unarmed people, and as a result, those unarmed people bled out. The order to shoot anything moves is the incident in Wuornosata. And that person was shot on an up-to-down trajectory standing on the second floor. And there's nothing that links any shoot anything that moves order to any of the decedents here. There's just none. And I would say that this court, this country was in chaos. And this court in Mamani 1 held that ordering the mobilization of a joint police force in a military operation is not an extrajudicial killing. Authorizing the use of necessary force to reestablish public order is not an extrajudicial killing. Of course it's not. Of course it's not. But when you are giving instructions to shoot at anything that moves, and the activity that you're talking about has happened more than a mile away from where shooting at anything that moves is occurring, and when it's happening in five different locations over three days and everything is happening the same way, it seems like that is all part of deliberated killings of individuals. I mean, there was also evidence that Berzane was present and made a comment during the meeting about how when he came back into power, they were going to make sure they didn't have the same problems with the water war that the earlier president was having because they would just shoot 50, 100, 1,000 people. There's nothing there about shooting unarmed civilians. And as far as Mr. Berzane being on the ground, again, we have to look at the record because the plaintiffs are conflating two different things. Mr. Berzane was in Sarada, which is where the terrorists were rescued. The terrorist buses left Sarada peacefully. Nobody was killed there. None of the plaintiffs were killed there. War Asada is an hour away. So to say that Mr. Berzane was on the ground in two of the sites where it happened, there's just no support in the record for that. It just, it's not there. And the second place where I presume they're talking about. I'm talking about the discussion that he had when they were not in power yet. That was in the year 2000. That was three years before. That was testimony of talking about the prior administration where there had been something called a water war, and there were musings about how are we going to deal with conflict like that. Nothing about a plan to shoot unarmed civilians. Nothing about a plan to shoot anything that moves. And, in fact, under the military structure in Bolivia, the president in this, talking about orders, the president issued two orders in this case. One on September 20th, reporting that there had been a serious guerrilla attack in War Asada, and he ordered the general commander, the general to mobilize, use the necessary force to restore public order. And the second order was on October 11th to General Claros Flores. Can you tell me the record sites for those two orders? Yes. September 20th and October 11th. Yes. September 20th is Volume 5 of the appendix, Volume 5, Document 506-3. 506-3? Yes. And then the October 11 one? Yes. It's Volume 5, Document 506-26, and that said that they were to arrange the necessary security measures to restore order in El Alto because people were blowing up gas stations. The town was surrounded. They had pushed rail cars to block the roads. The hospital had no oxygen. Infants were dying in the hospital. It was complete chaos, and those facts were unrebutted and undisputed. Is that in Cerrado? So Cerrado is the place where the tourists were held hostage. That's where the tourists were? Yes. Okay. But the death in this case happened in War Asada, which is an hour away. What happened was the buses left Cerrado. So they were being held hostage in Cerrado, weren't they? I'm sorry? Were they being held hostage? Yes. There were 800 of them, and as you can imagine, people from the United States, Germany, England that had tourists who were trapped there were putting tremendous pressure on the president to get them out. And so they come in in buses. They come to the outskirts of town, and a military and police force was coming from the south to make sure they had safe passage through War Asada, and they got ambushed. And that's when Vargas said, I saw people in the trees. There were people shooting from the homes, shooting from the hills. I want to talk about September 20 in War Asada. The 8-year-old Marlene Nancy Rojas-Momos was killed by a bullet when she moved in front of a window in her home. The mother saw soldiers outside. And is she the only one that was killed in War Asada? Yes, Your Honor. Okay. And she was inside the house? She was inside her home. Okay. Right. And this was when they were trying to bring the caravan of tourist hostages through the town? Yes, and that's when they were ambushed, and there was firing coming. It's in the record. Well, didn't that occur about a mile away from where Marlene lived? It's about 1,000 meters was the evidence, and that's from Mr. Cassidy. Okay. I'm sorry. I'm not too good at converting, but I think this is . . . It's about a half a mile, and the testimony is that the 7.6 . . . And now her father says, there was nothing happening near my home, no protests, no armed civilians. So what do we do with that?  when his daughter was killed. And he was not in the town. And he was in the hills hiding behind a rock, and somebody came and told him his daughter had been killed. That's their eyewitness that nobody saw her get shot. And the fact showed that the military in the town was taking fire from homes in the surrounding hills. And so those are what the facts are. That is a precipitate shooting. There's no evidence of who fired any shot or why, whether she was shot. It was a mistake for somebody who was a threat, who was not a threat. Do we know who . . . This court has held that those are not extrajudicial killings. Do we know who the particular soldier was, or that he was a soldier that did that? Do we know that? No, that nobody knows. Nobody knows. Persons. There's nobody that knows any of that, and so it's impossible to know. You have to make an inference first that it was a soldier that fired the shot, then that it was done intentionally, as opposed to perceiving they were under a threat and shot, or reacting to something, or doing it for some personal reason not linked to the defendants in any way. And it's inference on inference on inference, and there's no evidence to support them. That's the first victim I was trying to figure out the circumstances. Can I turn to October 12th? And I guess in Cata El Alto, and Lucio Santos Carreras Ayala was fatally shot as he leaned out from behind a street kiosk while we were seeking cover. He was not armed. And it looked like on that day there were police insurgents. So what is your analysis of why that's not an extrajudicial killing? First of all, the eyewitness to that is the one who said, I couldn't tell whether it was any of the military that gave the shot because all I did was hear the shot. And who was the eyewitness? His name is Castano. But he also said that he witnessed five officers positioning themselves to shoot and pointing at the civilians. Right. Did he not? He did. And what he testified is he saw them, and then he walked an additional block and a half away from that, then crossed the street, and then looked Cata Corner. And did he also testify that he never saw an armed civilian at any point during that day? He did testify to that. But the Supreme Court has said that the court should give credence to uncontradicted and unimpeached evidence. And there's evidence that in El Alto, the military was being attacked with dynamite and armed insurgents, and that the city was at a complete standstill because of all this violence that was going on. Two or three of the victims who, as you said, bled out, couldn't get to the hospital because of the blockade set up by the insurgents. And it was at a complete standstill. And so in these circumstances of a president trying to respond to a terrible national emergency, he issues two orders, general orders. At that point, under the Bolivian military structure, all he can do is issue an order to the general commander, and then the general commander says, I get the initial concept. This is General Veliz Herrera who said this. I get the initial concept, and then the military plans the operations, and neither the president nor the defense minister has any role, any involvement. And under the Manual for the Use of Force, to your point about the order, shoot anything that moves, the unit commander is the only person at all times who has the authority to tell people to open fire. And so there's nothing that links anything that anybody did to the defendants in this case, and they certainly did not have the ability to control. That's the secondary question, right? I mean, that's the command responsibility. That's right. And they were actually under legal obligation to call in the military because it's undisputed that the police were insufficient because police in Bolivia don't carry lethal ammunition. They carry gas guns and riot gear, and that's just the way their structure is a little different from the way it is here in this country. So he had a legal obligation to call in the military, and Vice Minister Harb described it. He said that the president was trapped between his legal obligation to call in the military and a political solution of trying to continue negotiating. I see my red lights flashing, and I'm happy to answer any of your questions. I have another question. And this is about Rio Seco and the El Alto area on October 12th. That seems to be where the third victim went to the rooftop of a house to observe and was shot in the head, and that's where the officer shot a civilian and was ordered to fire, and the soldier refused. The officer killed him. That seems to be all in the same area. And she went to the rooftop and was shot in the head. Why would that not be a question of fact on that one? Assuming you've got the chain of command, I'm talking about on the extrajudicial killing. Well, there's no eyewitness, so we don't know who fired a shot or why. We do know that it's uncontested that there were insurgents on the rooftops firing down at soldiers. We know that in that case, the witnesses who testified about that death, Guzman Apaza, testified that he heard explosions for half an hour up until the time his sister was shot. That's why they went up on the roof to see what was going on. Explosions with the dynamite that the insurgents had. They were throwing dynamite at fuel trucks. They were attacking government and police stations. They were blockading the roads. Soldiers got killed in each of the locations. The military was responding to armed insurgents whose stated goal was to overthrow the president, and they weren't going to stop until that happened, and they succeeded. I think we have your page. Thank you. Your colleague has suggested that you haven't connected up the soldiers, I guess, who were allegedly engaged in the deliberated shootings with the victims in this case. He says that you've taken some liberties with your description of the record. I don't know if you'd like to address that. Yeah, I'd love to address it, Your Honor. We agree with opposing counsel that you should look beyond the briefs, and you should look in the record in this case because it's incredibly extensive. Although they cherry-picked certain statements that they think support their case, all this evidence was presented to the jury, and the jury found in our favor. And I'll actually address some of the specific points that my friend on the other side talked about. One he talked about, he said, well, there's no evidence that any of these shooters were ordered to shoot at civilians. We have direct testimony. Did Captain Belmonte give orders... This is on, excuse me, document number 480, in appendix three. Did Captain Belmonte give orders to you and the other soldiers in your unit? Yes. And what were those orders? To shoot. Question, to shoot what? Answer, the civilians. And did the soldiers follow those orders? Yes. How long did the shooting last? Approximately 45 minutes. Okay, that was one of the points that my friend on the other side mentioned. Another one, this is the death of Lucio. As Your Honor pointed out, this was a situation where... At what location? This is in the... This is El Alto location, Rioseco. This is appendix five, document 500-4. The name of the victim is who? It's Lucio, L-U-C-I-O. This is the situation where the witness saw, Castaño, saw five soldiers line up and shoot. And here's how the testimony came in. So this is Mr. Castaño, who's a local there. So right there at the corner, a man leaned over or reached out to look and see. Wait, actually, let me go to the prior page. This is on... This is page 34 of the deposition transcript that was read in. So I walked in perhaps five minutes forward along the Kenco. That's when I turned around again, and I saw that the military were positioning themselves to shoot. How many military did you see? So I saw five. There was one standing up, positioned to fire. There was one on his knee, bent knee, positioned to fire. And right at that spot, there's a little mound of earth. And then the next page, he says he continues to move since this was a war zone, and soldiers were aiming at civilians. The next page. So right there at the corner, a man leaned over or reached out to look and see. And right then you heard, boom, a shot. So he fell back at the shot. Okay, this is testimony immediately after he sees soldiers lining up to shoot. A witness falls, a victim falls down and dies. And that is the sort of inference that a jury is allowed to reach. Now, we have testimony like that. He makes the point that we were having insurgents. They were shooting. They were using dynamite. Military was shooting. And I think I heard for at least three of them, he said there was no eyewitness. We don't know who fired the shot. We don't know whether it came from an insurgent who was on the rooftop or a surgeon who was over here, that there's no person who can be the eyewitness, I saw X fire the shot. Well, Your Honor, a few responses to that. First of all, we do have eyewitnesses to every single one of the shootings for at least four of them. No, but not people who say, I couldn't see, I heard it. I mean, I was behind a rock. You're saying if I go to the record, I'm going to find this eyewitness for every shooting. Well, just to be clear, there's an eyewitness for every shooting. For four of them, the eyewitness actually saw a soldier line up to shoot and the victim fall dead. Shoot the plaintiff. Shoot the plaintiff, correct. Yeah. Saw a soldier do it. For four of them. Which four are they? That is Arturo, Jacinto, Raul. They were all in, actually the first two were in Animas Valley and the second one is Ovayuho. The fourth is Lucio, the one we were just talking about in El Alto, the Senkata District. I'm sorry, you're going to have to go back over them again. Arturo. Arturo, Jacinto, Raul, and Lucio. And the other three were in what location? The other three were Warisata, the eight-year-old victim on the first day, Marlene. So in that situation, her mother saw her killed. Her father saw soldiers. Wait a minute, is she in the four or she's in the next group of four? Excuse me, she's in the next group of four. Okay, before you leave the first group, that there's an eyewitness who saw the soldier. Yes, yes. So we've already talked about Lucio. There were soldiers positioning themselves. That's El Alto. Where is the other three? The other three were, two of them were in Animas Valley. That's Arturo and Jacinto. And in Arturo's case, his son, Gonzalo, he actually witnessed his father being shot by the military. There's testimony that they're walking to their family's crop parcels. They got split up because his father was not able to walk along the path. So he watched his father. Was there insurgency going around in the area of these four victims? There was not, Your Honor. None? No insurgency going on? None of these? I mean, because we obviously are going to have to look at the records. Of course. And if you lose your credibility, because I'm going to write down what you tell me, it's not going to help. But you're saying there's no insurgency going on, no activity of anybody but the military for these four? There were blockades going on in those areas. It's undisputed that there were blockades, road blockades. But in terms of armed insurgency, in terms of shooting coming back at these soldiers, there was no testimony of that. And I can give you the sites. It's just obvious that all of us are going to have to read the record with a fine-toothed comb because you're in total disagreement on the facts. Well, Your Honor, respectfully, I think that given that this is a jury found in our favor. I own all counsel. I've been a judge 15 years. I know about jury verdicts. No, I simply mean, though, I don't think you need to go through a fine-toothed comb on both sides. Well, I'm going to read it. I've already read most of the record. I'm going to reread it in the light of what both you and your colleagues said. Certainly. But just to give you, Judge Hall, just to answer your question more specifically, for example, with Lucio, there was testimony. It's Appendix 5, Document 500 at 20, that a witness, the same witness who saw him die, said he never saw an armed civilian at any point during that day. So again, there were blockades. There were protests. There were marches. But in terms of armed civilians— Now tell me about the other four. You said for those four, you do have an eyewitness, and that eyewitness can actually identify, say, a soldier shot him. How about the other four? Right. Very quickly before I go to that, if you don't mind, just for all of the eight victims, again, there was testimony about things going on that day. A lot of it was contested. And in fact, there were two witnesses who actually testified that they were coerced to give false statements. But for each of these victims, there was testimony that in the particular time and location where they were shot and killed, there was no chaos and no armed insurgency. If you look at our reply brief on page 6, I believe— And one last thing I wanted to ask you. It goes through all the no-armed civilians. I'm sure you have an answer for it, and I think I saw it in your brief. But the jury verdict was interesting here because they said there was no intentional killing, wrongful killing, but yet they say there was deliberate killing. And I understand some of the fine niceties that you say one's different than the other, but it sure sounded like somewhat of an inconsistent verdict to me. Well, a couple of things, Your Honor. One, the district court found it was not inconsistent. That's a footnote four of his opinion below. But second, we think it's not inconsistent because on the one hand, the question was whether the killings were deliberate. On the other, whether they were willful and intentional. A conjunctive standard. The suggestion with willful and intentional suggests that willful must mean something beyond intentional. And in fact, I think defendants even concede in their brief at page 20, they say the jury in rejecting the no-wrongful death verdict actually held that the deaths were not wrongful, not intentional, and not malicious. So I think they agree with us that willful and intentional implies something more than intentional and implies maliciousness. And in fact, if you look at the jury instructions on punitive damages, it actually says you can award punitive damages if you find that the defendants acted willfully and maliciously. So they actually linked those two terms as well. So we think that it clearly shows that far from being irreconcilable, the jury must have assumed it was a higher standard. To answer your question on the other four victims, so for each case, there was testimony that the victim was killed, and then immediately after, there were soldiers in the area, there were soldiers aiming, there was other evidence linking it to soldiers' deaths. So for example, Marlene's death, the eight-year-old, the mother testified that soldiers in camouflage were outside the window. She went to get her daughter, who was bleeding out, and she looked out the window and saw soldiers in camouflage. That's at Appendix 2, Document 476, pages 54 and 55. Okay, you've done a good enough job. I don't want to take any more time. You're over, so he's answered my questions. Any further questions, Your Honor? I think we have your case. All right, thank you very much. Court will be in recess at 9 in the morning.